THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE HUDSON RIVER BRIDGE COMPANY AT ALBANY, Appellant, *v.* STATE TAX COMMISSION, Respondent, and CITY OF ALBANY, Intervenor, Respondent.

(Special Franchise Tax Assessments for the Years 1927, 1928, 1933, 1934 — City of Albany.)

Third Department, April 30, 1941.

*Clive C. Handy [Frederick L. Wheeler, C. Raymond Hulsart, Jr., and Robert D. Brooks of counsel], for the appellant.*

*John J. Bennett, Jr., Attorney-General [Henry Epstein, Solicitor-General; Timothy F. Cohan and Jack Goodman, Assistant Attorneys-General, of counsel], for the State Tax Commission.*

*James J. McGuiness, Corporation Counsel [Joseph J. Casey and George Myers, Assistants Corporation Counsel, of counsel], for the intervenor, City of Albany.*

SCHENCK, J.  Relator appeals from a final order in proceedings brought to review by certiorari special franchise tax assessments

made against it in the city of Albany for the years 1927, 1928, 1933 and 1934. The sole issue involved is the legality of the special franchise assessments.

Respondent maintains that relator-appellant has a franchise right within the meaning of subdivision 6 of section 2 of article 1 of the Tax Law and that the occupancies for which assessments have been levied are several streets in Albany and the Hudson river. The relator, Hudson River Bridge Company, was created by chapter 146 of the Laws of 1856, whereby the Legislature authorized it to erect and maintain a bridge for the purpose of railroad travel and transportation. Pursuant to that statute and subsequent acts amendatory thereof, relator completed and opened for travel in 1866 a bridge across the Hudson river at Albany, known as the north, or freight, bridge, connecting with the New York Central Railroad on the west side and the New York and Harlem and Albany and Boston Railroads on the east side of the river, extending from a point near the railroad yards on the east side of the river to a point at or near the foot of Lansing street in the city of Albany. Pursuant to an amendment to its charter, by chapter 779 of the Laws of 1869, a second bridge was erected south of the north, or freight, bridge, known as the south, or passenger, bridge. This bridge extends from the New York Central Railroad Company's property on the Rensselaer side of the river to a point at or near Maiden Lane in the city of Albany. The north, or freight, bridge was thereafter rebuilt and is now a steel structure carrying two railroad tracks used exclusively for freight trains. It also has a six-foot sidewalk for pedestrian traffic. The total length of this bridge and its approaches is about one mile and extends from a point at or near the engine house of the Boston and Albany Railroad in the city of Rensselaer, across the Hudson river, Water street, Center street and Montgomery street to Lansing street in the city of Albany.

The south, or passenger, bridge was rebuilt in 1900 and is a steel structure carrying two railroad tracks extending from a point near the engine house of the New York Central Railroad in the city of Rensselaer, across the Hudson river and Maiden Lane to a point at or near Maiden Lane in the city of Albany. The total length of this bridge and its approaches is forty-five one-hundredths of a mile. This bridge is used exclusively for passenger trains. It also has a sidewalk for pedestrians. Each bridge is equipped with a draw swing for the convenience of river navigation. Tolls were charged pedestrians for the use of the sidewalk crossings until about 1926 and since that time the sidewalks of the. two

bridges have been used free of charge. There is no vehicular travel over either bridge.

For the purpose of financing the construction of the two bridges, relator issued 5,000 shares of stock with a par value of $100, of which 4,032 shares were subscribed by the New York Central Railroad, the Hudson River Railroad, and the Albany and West Stockbridge Railroad Company. The remaining 968 shares seem to have been subscribed by individuals, but in 1865 were absorbed by the three above-mentioned railroad corporations. Later, in 1899, after various mergers and consolidations, the New York Central and Hudson River Railroad Company, now the New York Central Railroad Company, acquired three-quarters of the stock and the voting rights of the remaining one-quarter held by the Boston and Albany Railroad.

While the relator originally charged the railroads for operating over the bridges and paid its own operating employees, the entire management now appears to be in the New York Central Railroad Company, the officers and directors of the railroad company being the officers and directors of the relator, the latter having no employees or offices, the entire operation of the properties being performed by the railroad company. Rails, ties and switches belong to and are assessed against the railroad company.

The theory of the referee's decision seems to be based upon the general proposition that " a special franchise is nothing more or less than a right or permission, granted by the State to a corporation, individual, *et cetera*, to use a public place which otherwise it would not have a common right to do. Such a privilege has been granted the relator by the State, and as such it is assessable as a special franchise."

Apparently, neither the relator nor respondent subscribes to the contention of the referee, although the respondent, of course, is satisfied with the result reached by the referee's ultimate determination.

It is contended by respondent that the relator possesses a " franchise, right or permission to construct, maintain or operate " a railroad within the meaning of subdivision 6 of section 2 of the Tax Law, and that this case is governed by the decision in *People ex rel. International Bridge Co.* v. *State Tax Comm.* (208 App. Div. 826; affd., 239 N. Y. 631). Respondent maintains that if the relator possesses merely one of the three rights set forth in the statute, that is, the right either " to construct, maintain or operate " a railroad, the structure is subject to special franchise assessment.

To determine whether or not the case at bar is governed by the decision in *People ex rel. International Bridge Co.* v. *State Tax Comm.*

(*supra*), in which the Appellate Division and the Court of Appeals affirmed the opinion and findings of the Special Term, it is necessary to consider the charters of the two corporations.

Section 1 of " An Act to Incorporate the International Bridge Company " (Laws of 1857, chap. 753) provides that all persons who shall become stockholders pursuant to the act are constituted a body corporate with power to associate with any other persons, company, association or corporation in Canada " for the construction, maintaining and managing a bridge across the Niagara River, from the City of Buffalo to some point near Fort Erie, in Canada, so as not materially to impede the navigation of said river; said bridge to be constructed with two draws, one across Black Rock harbor and the other across the main channel of the river."

Section 1 of the charter of the Hudson River Bridge Company (Laws of 1856, chap. 146) authorizes the construction of a bridge across the Hudson river at Albany, and provides that all persons who shall become stockholders pursuant to the provisions of the act are constituted a body corporate, " for the purpose of erecting and maintaining a bridge, for the purposes of rail road travel and transportation across the Hudson river, from some proper point on the westerly side or shore of the said river, in the city of Albany, to some proper point on the opposite side or shore of the said river, in the county of Rensselaer, as may be fixed and determined upon by the commissioners hereinafter named, with all the general rights and powers of a corporation conferred by law, and with all such incidental powers as may be requisite to carry out and accomplish the provisions of this act."   Provision is made for the regulation of draw swings in the interest of navigation.

The International Bridge Company built a bridge across the main channel of Niagara river, and another across Black Rock harbor.   The bridge contained a single railroad track across the main channel, a double track across Squaw Island, and a double railroad track across the bridge spanning Black Rock harbor. The tangible property consisted of the bridge structures, the railroad tracks and the machinery used in operating the draw swings. The company neither owned nor operated any trains, engines, cars or other equipment for the conveyance of passengers and freight over the bridge.

The learned justice at Special Term, however, refused to find that the bridge company neither owned, maintained nor operated a surface, underground or elevated railroad, and refused to find that the bridge company had no special franchise, as defined in subdivision 6 of section 2 of the Tax Law.   He did determine,

however, that the corporation had obtained its charter to erect, maintain and operate the bridge and all of the appurtenances from the State, which at the time was the owner of the fee to the bed of the river and controlled the same subject to the rights of the Federal government to regulate navigation.

The relator points out that while there is a similarity in the phraseology of the two charters, the International Bridge Company acquired additional powers of management and control over the operation of trains on its property, and that while the relator was given authority " for the purpose of erecting and maintaining a bridge," in writing the International Bridge Company's charter, it was thought necessary in order to suit their purpose to add the word " managing."

I am not impressed with this argument. Relator's charter is clear and unambiguous. It was constituted a body corporate to erect and maintain a bridge for railroad purposes. As I read the Tax Law (§ 2, subd. 6), the co-existence of all three rights, i. e., " construct, maintain or operate," is not required to bring the corporation within the provisions of the section. Relator did construct, and for a considerable period of time did maintain and was given the right to operate and did operate the bridges for the purpose of railroad travel and transportation. In the case of the International Bridge Company, the employees were paid by the railroad company, such payments being charged to the bridge company. In the case of the relator, the employees were paid by the railroad company, but no charge was made to relator. The railroad company hires all of the employees and pays their wages. At best this is but a matter of bookkeeping. As pointed out by respondent, while the Grand Trunk Railway Company maintains the fiction of an independent subsidiary by hiring employees in the name of such subsidiary and charging to it the employees' wages, the New York Central Railroad " is a little more realistic and hires all the employees in its own name and does not charge their wages " to the relator. May a railroad company, desiring to cross a public place, escape the provisions of the Tax Law by causing the incorporation of a " crossing company " and thereafter furnishing the money for the building of the necessary structure? We think not.

For upwards of half a century of operation relator owned the tracks on its bridges and approaches. After 1920 it apparently ceased to be an operating company. As heretofore pointed out, it had no independent office nor did it have any employees. It was and continues to be a subsidiary wholly controlled by the railroad company, but has never lost its right to construct, maintain

or operate a railroad within the meaning of the Tax Law. As such, it is liable to special franchise assessment. Its structures cross the Hudson river, concededly a navigable stream, and also cross public streets within the city of Albany. This crossing privilege is not a mere right granted by the Legislature to construct a bridge over a public place. By its charter the relator was constituted a body corporate for the purpose of constructing and maintaining structures for railroad purposes.

The decision in *People ex rel. International Bridge Co.* v. *State Tax Comm.* (*supra*) is applicable here, and the order appealed from should be affirmed and the assessments herein sought to be reviewed should be confirmed.

HILL, P. J., CRAPSER, BLISS and HEFFERNAN, JJ., concur.

Order affirmed, with fifty dollars costs, and the assessments herein sought to be reviewed confirmed.