THE PEOPLE OF THE STATE OF NEW YORK ex rel. NEW YORK
CENTRAL RAILROAD COMPANY, Respondent, *v.* STATE TAX
COMMISSION, Appellant, and CITY OF ALBANY, Intervenor,
Appellant.

(Special Franchise Tax Assessments for the Years 1921–1928, 1934—
City of Albany.)

Third Department, May 6, 1942.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor-General, Timothy F. Cohan* and *Jack Goodman, Assistant Attorneys-General,* of counsel], for the State Tax Commission.

*James J. McGuiness, Corporation Counsel* [*Joseph J. Casey* and *George Myers, Assistants Corporation Counsel,* of counsel], for the intervenor, City of Albany.

*Clive C. Handy* [*Frederick L. Wheeler* and *C. Raymond Hulsart, Jr.,* of counsel], for the respondent.

SCHENCK, J. The State Tax Commission appeals from final orders entered in the office of the clerk of Albany county in proceedings instituted by relator, New York Central Railroad Company, to review by certiorari special franchise assessments levied against the relator in the city of Albany for the years 1921–1928 and 1934. The proceedings were referred to a referee to take evidence and hear, try and determine all questions raised by the petitions and returns and to make his findings and determination thereon. Upon the decision of the referee final order in each proceeding was entered and the assessments levied for the following occupancies were vacated: (1) the two Hudson river bridges at

Albany for years 1921–1928 and 1934; (2) Watervliet avenue 1921–1928; (3) Van Woert street crossing 1921–1928; (4) Tivoli street 1921–1928 and 1934.

The Tax Commission levied assessments for the years under review against the relator by reason of its crossing of the Hudson river over two bridges, the north, or freight, bridge, and the south, or passenger, bridge of the Hudson River Bridge Company between Albany and Rensselaer. The bridge structures proper were assessed against the owner, the Hudson River Bridge Company. (*People ex rel. Hudson River Bridge Co.* v. *State Tax Comm.*, 261 App. Div. 700.) The only tangible property included in the assessment against relator was the track and signal equipment concededly owned by relator. In vacating these assessments the referee held that the relator possessed no special franchise to cross the Hudson river and that any rights it may have to operate its trains across the bridges are derived from the bridge company and not by a special franchise of the State.

To constitute a special franchise, two elements must be present, the element of physical property in, upon or above a street, public place or public waters, and a grant from the State of the right to construct, maintain or operate the same. If either the tangible or intangible element is missing, there can be no special franchise within the meaning of the Tax Law. (*People ex rel. Barron* v. *Knapp*, 208 App. Div. 127; affd., 239 N. Y. 581; Tax Law, § 2, subd. 6.) The existence of the tangible element is conceded and the referee has found that the relator owns the tracks, rails, ties and signal equipment on both bridges. There is, however, a sharp dispute as to the existence of the intangible element, and the referee has determined that the relator has no permission or authorization from the State " to operate its railroad over the Hudson river at Albany, its right in that respect being derived from the Hudson River Bridge Company at Albany under an implied lease by virtue of stock ownership and control." Apparently, the referee relies upon *People ex rel. Grand Trunk Railway Co.* v. *Gilchrist* (248 N. Y. 97). It will be seen, therefore, that the real issue here presented is — does the relator derive its right to operate its trains over the bridges of the Hudson River Bridge Company from the bridge company or from the State. To determine this it is necessary to go into the history of the relator as well as the history of the bridge company.

The earliest company appears to have been the Mohawk and Hudson Railroad Company, organized pursuant to chapter 253 of the Laws of 1826. The corporate purposes included construction of " a single or double rail road or way betwixt the Mohawk and

Hudson rivers; commencing from the Hudson river at any point within the bounds of the City of Albany * * *." Subsequently, the corporate name was changed to Albany and Schenectady Railroad Company. (Laws of 1847, chap. 91.) The Albany and Schenectady Railroad Company and other railroad companies whose roads connected and extended through the State from Albany to Buffalo were consolidated under the name of New York Central Railroad Company, the company thus formed operating a railroad running from the west bank of the Hudson river at Albany, westerly across the State. (Laws of 1853, chap. 76.)

The Hudson River Railroad Company was organized pursuant to chapter 216 of the Laws of 1846. That company was given " power to construct a single, double or treble railroad or way, between the cities of New-York and Albany, commencing in the city of New-York * * * and ending at some point on the Hudson river, in the county of Rensselaer, opposite the city of Albany * * * and to transport, take or carry any property and persons upon the same * * * for the term of fifty years from the passage of this act; it being expressly understood that nothing contained in this act shall authorize or allow the construction of a bridge across the Hudson river; but the said company may, with the consent of the corporation of the city of Albany, establish a ferry across the said river at Albany, for the accommodation of the business of the said railroad." Thus, we have a railroad running from the city of New York to a point on the easterly side of the river opposite the city of Albany with the right to establish a ferry crossing at Albany, provided the necessary consent of that city should first be obtained.

The Albany and West Stockbridge Railroad Company had been incorporated in 1836 with power " to construct a single or double rail-road or way, from the Hudson River at the village of Greenbush, (now city of Rensselaer) * * * to the line of the State of Massachusetts." (Laws of 1836, chap. 262.) Later the corporate powers of this company were enlarged to include the " power to construct one or more depots at some suitable place or places in the city of Albany; and to connect the same with such rail-road by a single or double track, with suitable turnouts and branches, with the consent and approbation of the corporation of said city: But no part of this section shall be so construed as to authorize the said company to construct a bridge across the Hudson river, or in any manner to obstruct the navigation of the same." (Laws of 1840, chap. 111.) It will be seen that while the Legislature granted to both the Hudson River Railroad Company and the Albany and West Stockbridge Railroad Company the right to cross the Hudson river

at Albany, the crossing was limited to water ferries, there being then no railroad bridge crossing at Albany. The Hudson River Railroad Company, operating from New York to Albany, was consolidated with the New York Central Railroad Company of 1853, which operated between Buffalo and Albany, to form the New York Central and Hudson River Railroad Company. (Laws of 1869, chap. 917.) Section 1 of said act made it lawful for any railroad company operating a railroad or bridge either wholly within or partly within the State to merge and consolidate with any other railroad company or companies organized under the laws of this State or any other State " whenever the two or more railroads of the companies or corporations so to be consolidated shall or may form a continuous line of railroad with each other, or by means of any intervening railroad bridge or ferry."

The New York Central and Hudson River Railroad Company, formed under the act of 1869, was merged with several other companies in 1913, retaining the name New York Central and Hudson River Railroad Company. Thereafter, in 1914, the present relator, New York Central Railroad Company, was organized as a result of further consolidation of several companies, including the New York Central and Hudson River Railroad Company. Albany and West Stockbridge Railroad Company had become part of the Boston and Albany Railroad Company, and the latter company, in 1899, leased all of its " property  *  *  * rights, franchises, easements and privileges " to the New York Central and Hudson River Railroad Company, relator's predecessor. By virtue of such mergers, consolidations or leases, the relator herein became possessed of the franchises and rights of the original New York Central Railroad Company of 1853, the Hudson River Railroad Company of 1846, and the Albany and West Stockbridge Railroad Company.

The history of the Hudson River Bridge Company is set forth at considerable length in *People ex rel. Hudson River Bridge Co.* v. *State Tax Comm.* (*supra*). The company was created by chapter 146 of the Laws of 1856, which statute was subsequently several times amended. By virtue of the powers therein granted, Hudson River Bridge Company built two bridges across the Hudson river at Albany. The north bridge, or freight bridge, was constructed in 1866, and the south bridge, or passenger bridge, in 1870. Its charter provided, among other things, " Any rail-road corporation may subscribe to and become the owner, with the like rights as an individual, of any part of the capital stock of the said corporation hereby created." Prior to 1865, the original issue of stock had been acquired by the three railroad companies, to wit, the old New York Central Railroad Company, the Hudson River Railroad

Company, and the Albany and West Stockbridge Railroad Company. The bridge company's charter further provided: " Any rail-road corporation whose road now has or shall hereafter have a terminus at, or shall run its trains to or from said city of Albany or East Albany, (now city of Rensselaer) or shall run its trains in connection with any road having such terminus, *shall be permitted to use said bridge for rail-road purposes* upon such terms as the directors of the several companies interested may agree, and in case they shall not be able to agree, the terms shall be fixed by the Canal Board." Pursuant to its charter the bridge company imposed tolls on the railroad operating across its bridges. The collection of such tolls appears to have ceased some time prior to 1921. Apparently, no agreement ever existed between the Hudson River Bridge Company and the relator with respect to the operation of the relator's trains across these bridges.

In reaching the conclusion that the relator operates over and upon the bridges " under an implied lease by virtue of stock ownership and control," the referee has relied upon *People ex rel. Grand Trunk Railway Co.* v. *Gilchrist (supra),* and cites the same in his decision. In that case the State Tax Commission endeavored to impose a special franchise tax on the Grand Trunk Railway Company of Canada for a crossing of the Niagara river at Niagara Falls on a bridge owned by Niagara Falls International Bridge Company. The court there held that a right derived from the State to operate a railroad over a navigable stream is a special franchise which may be taxed, but the operation of a railroad on a bridge over such stream, not under permission or authority granted by the State to the railroad company but under permission granted by the bridge company acting under authority derived from the State is not such special franchise within the meaning of the Tax Law and an assessment upon the right to so operate its railroad must be vacated. We have no such situation here. In the *Grand Trunk* case the bridge company by an act amending its charter was granted the power to build a railroad and carriage bridge across the Niagara river and to enter into any contract or agreement with any railroad company with reference to the terms of crossing with passengers or freight cars over said bridge. (Laws of 1853, chap. 622.) In 1855 the bridge company built a double-decked bridge, the lower deck being used for pedestrian and vehicular traffic, and the upper leased to the predecessor of the Grand Trunk Railway Company for the purpose of constructing a railroad thereon and operating trains over the same. The Grand Trunk Railway Company occupied the upper bridge floor under lease from the bridge company at an annual rental of $80,000. The court held that a mere per-

mission of the State to the railroad company to operate its railroad within the State, in itself, confers no special right or privilege to encroach upon the rights of the public on a highway or public place and that the railroad company received no rights from the State except to exercise its corporate powers and that any consent for this river crossing was by virtue of a contract with the bridge company. Judge LEHMAN, writing for a majority of the court (three judges dissenting), points out that the general franchise of a corporation is its right to live and do business and such permission confers no special right or privilege to encroach upon highways or public places. Further, that without a lease or permission from the bridge company, the operation of the railroad on the bridge would constitute a trespass, and that the use of the bridge for the operation of the railroad thereon was derived solely from the bridge company and constituted no special franchise. " If the exercise by the relator of its corporate franchises in a public place is not based upon authority granted by the State; if it does not rest upon public favor rather than private right, the relator enjoys no special franchise " (p. 102). And again, " After the bridge was constructed upon the conditions fixed by the State, the bridge company, and not the State, could grant or withhold permission to use the bridge for railroad operation " (p. 103).

We find no such situation in the instant case. While the Niagara Falls Bridge Company " could grant or withhold permission to use the bridge for railroad operation," the charter of the Hudson River Bridge Company specifically provided that any corporation whose railroad has a terminus at Albany " shall be permitted to use said bridge for rail-road purposes." The State granted to such railroad company the right to use the bridge. It was a condition imposed upon the bridge company at the time of the granting of its charter. True, the bridge company could suggest the terms upon which said crossing would be made, but in the event that the railroad company refused to operate under such terms it had but to ask the intervention of the Canal Board and have the terms fixed by that body. Clearly, the bridge company could not prohibit such crossing as in the case of the Niagara Falls International Bridge Company, where, as Judge LEHMAN said, the bridge company " could grant or withhold permission to use the bridge for railroad operation " (p. 103). The rights to crossing which the relator acquired from its predecessors came from the Legislature and were not dependent upon the consent of the bridge company. The relator's predecessors acquired from the Legislature the right to cross the Hudson river by ferry. When the bridge company was granted its charter, the railroad companies were likewise specifically granted the

privilege of crossing the bridges which were subsequently built. This was a grant from the State and the intangible element required to warrant the existence of a special franchise, it being conceded that the relator owns tangible property consisting of tracks, rails, ties and signal equipment located on the bridges.

Passing to the question of whether or not relator possesses a special franchise to cross Watervliet avenue in the city of Albany, it will be found that the referee held that the relator was a prior occupant of the land now constituting this public street. The referee has found that the old Sand Creek road existed as a public highway prior to the construction of the Albany and Schenectady Railroad and was crossed by the tracks of that company. The location of the road was thereafter changed and a new highway constructed in July, 1857, at which time the old road was closed. Notwithstanding the relocation of the old Sand Creek road, it is apparent that the relator does occupy a portion of the public street in question, to wit, Watervliet avenue. The parcel, while small, was a part of a public road prior to the construction of the railroad and has ever since remained such. In fact, relator concedes that it was not a prior occupant of this piece of land, which may be described as a small triangular parcel. The referee held that the former crossing of the railroad over the old Sand Creek road was discontinued and that the new street, Watervliet avenue, was laid out partly over land owned by the railroad company, and partly over land owned by an individual. Relator contends that the referee was confronted with a single lump sum assessment, the major portion of which was based on illegal items or elements. The fact remains, however, that there was no prior occupancy of this small triangular parcel. We are not concerned with the amount of this special franchise assessment. The relator concededly occupies a portion of a public street which existed prior to the construction of its crossing and is, therefore, subject to a special franchise assessment. If the amount of this assessment was excessive, the relator had an adequate remedy at law. The question of the reasonableness of the assessment is not before us. Especially is this true in view of the stipulation of the parties which provides " that for the purposes of these proceedings the valuations as fixed by the State Tax Commission for the alleged occupations designated ' Van Woert Street,' * * * ' Watervliet Avenue or Everett Road,' * * * ' Hudson River Freight Bridge,' ' Hudson River Passenger Bridge,' are correct for each of the years under review." We can only find that at the time the assessment was made there was an occupancy of a portion of a public street and that such occupancy by relator with its rails and ties constituted a special

franchise assessable under the Tax Law. The referee in his decision makes reference to a decision of a prior referee made in 1923, which is adverse to the Commission's present claim, holding that such decision was *res adjudicata* as to subsequent years. The doctrine of *res adjudicata* has no application here. (*People ex rel. Hilton* v. *Fahrenkopf*, 279 N. Y. 49.) Furthermore, *res adjudicata* is an affirmative defense that must be pleaded and proved. (*Krekeler* v. *Ritter*, 62 N. Y. 372; *Westminster Church* v. *Presbytery of N. Y.*, 211 id. 214.)

As to the Van Woert street assessment, the referee held that relator was a prior occupant and for that reason the assessment was illegal. It is provided by section 290 of the Tax Law that any person claiming to be aggrieved by an assessment must present a duly verified petition setting forth that the assessment is illegal, and " specifying the ground of the alleged illegality, or if erroneous by reason of overvaluation, stating the extent of such overvaluation." Relator's petitions fail to specify the alleged illegality of the Van Woert street assessments, and the only reference to illegality by reason of prior occupancy relates to Watervliet avenue, already considered in this opinion.

Obviously, the petitions were insufficient and failed to conform to the requirements of section 290 of the Tax Law. If the relator was aggrieved by illegality of assessment, it was required to specifically state the grounds in its petitions. This it has failed to do. In *People ex rel. L. I. R. R. Co.* v. *Tax Comrs.* (231 N. Y. 221) the validity of the assessment was challenged upon the grounds of overvaluation, inequality, the inclusion of the value of the bridges carrying highways, and prior occupation by relator of certain crossings. In respect of the last items, the court said (at p. 228): " The relator is undoubtedly correct in its contention that certain of the crossings which it occupied before the highway was laid out were not subject to assessment. (*People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Woodbury*, 203 N. Y. 167.) The learned justice at Special Term, however, denied relief in this respect because of the insufficiency of the petition. The relator could have set out this information in the complaint filed on grievance day as well as in the petition for the writ. It had accurate knowledge as to the crossings over which it had prior occupancy, and its failure to set forth such information justified the court in withholding relief in this respect."

The relator having failed to raise the issue of legality of the Van Woert street assessment in its petition, that issue was not before the referee, and his holding in that respect should be reversed.

The final issue presented concerns the legality of an assessment for a special franchise for the years 1921–1928 and 1934 by reason of relator's occupancy of Tivoli street in the city of Albany. The main line track of the railroad is located in Tivoli street. Ten side tracks run from the main line to serve ten different industries. The franchises or rights to the construction of these side tracks were sold by the city of Albany to the several industries. Seven of these industries have assigned their franchises to the relator, while the other three, to wit, James Ackroyd & Sons, E. S. Van Loon, and the Albany Gravel Company, entered into private agreements with relator. These agreements called for the construction by relator of side tracks at the expense of the industry, the ownership of the rails, switches, and fastenings in the side track to remain in the relator. While the decision of the referee as to the illegality of all of the said ten side track assessments is not clear, we may take it that he held that the assessments for special franchises for the three side tracks running from the main line to industries which had not assigned the franchises or rights to the relator were illegal for the reason that the right granted by the city of Albany to construct, maintain or operate these tracks was in the industry and not in the relator. The Tivoli street assessment was in a lump sum and the referee held included certain trackage situated outside of the street limits. It is conceded that the lump sum assessment included the three industrial sidings, permits for the construction of which had been retained by the three industries and had not been assigned to the relator. It is also admitted on the part of the appellants that certain portions of trackage had been erroneously assessed in making up the total Tivoli street assessment. Apparently, 450 feet of track on the side track serving the North Hudson Chemical Company was assessed when, as a matter of fact, but 260 feet should have been assessed, and in the year 1934 the side track serving the Albany Gravel Company and designated as a turnout should not have been assessed at all. In the case of the industrial siding of James Ackroyd & Sons, the Tax Commission assessed 570 feet of track in the years 1921–1928, and 685 feet of track in the year 1934, when but 529 feet should have been assessed. The referee has held the entire Tivoli street assessment void. He determined that the relator had no rights in connection with the three industrial sidings except such as it obtained from the three industries which owned the permits or franchises, and that it had received no right or special franchise from the State except to operate its main line track on that street. In other words, the referee bases his decision solely on the ground of the illegality of assessment and not on the ground of over valuation. Concededly,

the inclusion in the property assessed of certain portions of the three side tracks situated beyond the street lines was improper. However, the inclusion of such non-assessable property does not warrant the invalidating of the entire assessment. At best, it presents a question of over valuation.

The relator owns all the tangible property in the main track and the side tracks, including the three industrial sidings in question. It is conceded that the industries served by these three industrial sidings had no authority to operate a railroad over a public street. The city of Albany sold these side track permits to the three industries, but it may not be seriously contended that such permit carried with it a grant or power to operate a railroad. A special franchise is the right to " construct, maintain or operate " a railroad (Tax Law, § 2, subd. 6), and the power to so " construct, maintain or operate " springs from the State and is not subject to grant by a municipality. True it is that a railroad corporation may not construct its road upon or across any street of a city without the assent of the corporation of such city. (Railroad Law, § 21.) It may well be that the city may consent or refuse to consent to the construction of the railroad upon or across a city street, but the city has no power to grant to a corporation the right to operate a railroad. That right can be acquired only from the State. (*City of New York* v. *Bryan*, 196 N. Y. 158.) In *Beekman* v. *Third Ave. R. R. Co.* (153 N. Y. 144,) the court said (p. 152): " The authority to make use of the public streets of a city for railroad purposes primarily resides in the State, and is a part of the sovereign power, and the right or privilege of constructing and operating railroads in the streets, which for convenience is called a franchise, must always proceed from that source, whatever may be the agencies through which it is conferred."

As pointed out in *City of New York* v. *Bryan* (*supra*), the consent of the city was but a step in the grant of a single, indivisible franchise to construct and operate a railroad. Referring to section 32 of the Railroad Law, we find the provision that any individual, joint stock association or corporation engaged in any lawful business in this State may " except in any city of the State " lay down and maintain railroad tracks on or across any street or highway not exceeding three miles in length for the purpose of rendering such place of business more accessible to the public, upon obtaining the written consent of the owners of any lands bounded on and of the local authorities having control of that portion of the street or highway upon which it is proposed to construct or operate such railroad. It is apparent that the intangible rights or franchises were in the relator and not in the three industrial plants. Further-

more, the permission and approval granted by the Public Service Commission ran to the industry and to the relator.

In the last analysis, the only issue here presented is that of over valuation. Concededly, the Tax Commission erred in assessing certain trackage lying without the lines of a public street. These are errors of valuation and do not relate to the legality of the assessments nor to the jurisdiction of the Tax Commission. While relator raised the issue of over valuation by its petitions, no proof of over valuation was presented at the hearings before the referee. Therefore, on this appeal the question of over valuation may not be considered. We are concerned only with the question of the legality of the assessment. The referee erred in holding void the entire assessment on Tivoli street.

The orders appealed from should be reversed and the assessments heretofore vacated by the referee should be confirmed.

BLISS, HEFFERNAN and FOSTER, JJ., concur; HILL, P. J., dissents. *People ex rel. Grand Trunk Railway Co.* v. *Gilchrist* (248 N. Y. 97); *People ex rel. Erie R. R. Co.* v. *State Tax Comm.* (246 id. 322) are authorities requiring affirmance.

Orders appealed from reversed on the law and facts, with costs, and the assessments heretofore vacated by the referee confirmed.

The court makes and finds the following requested findings of fact submitted by the appellant, State Tax Commission, to the referee: Nos. 8, 14, 16, 18, 20, 25, 30, 31.

The court makes and finds the following new findings of fact:

1. That that portion of Watervliet avenue which lies within the north and south limits of the railroad right-of-way and which coincides with that portion of old Sand Creek road crossed by the railroad, was a public place prior to the construction of the railroad and has remained a public place despite the relocation of the major portion of Watervliet avenue.

2. That the relator in its petitions for writs of certiorari to review the assessment of the Van Woert street occupancy for all the years under review, failed to specify the ground for the alleged illegality thereof.

Appellant State Tax Commission's requested conclusions of law Nos. 3, 4, 6, 9, 10, 14 and 15 are hereby made, approved and adopted.

The court makes and finds the following additional conclusions of law:

1. That the assessment against the relator for the occupancy of Van Woert street should be sustained for all the years here under review for the reason that the petitions for the writs of certiorari

relating to the said assessment failed to comply with section 290 of the Tax Law in that they failed to specify therein the ground of the alleged illegality.

2. That the assessments against the relator for its occupancy of Watervliet avenue for the years under review should be sustained.

The following requested findings of fact submitted by relator and made and found by the referee are hereby reversed: Nos. 18, 20 and 21.

The following conclusions of law submitted by the relator and made and adopted by the referee, are hereby disapproved: Nos. 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17.